UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KARI TAYLOR                                          CIVIL ACTION

VERSUS                                              NUMBER: 14-0573

CAROLYN W. COLVIN,                                 SECTION: "C"(5)
ACTING COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's application for Disability Insurance Benefits ("DIB"). (Rec. docs. 11, 12).

Kari Taylor, Plaintiff herein, filed the subject application for DIB on September 17, 2011, with a protective filing date of August 16, 2011, alleging disability as of January 1, 2007. (Tr. pp. 128-131, 168). In a Disability Report that appears in the administrative record below the conditions that limited Plaintiff's ability to work were identified as spondylosis, depression, and drug addiction. (Tr. pp. 171-181). Those conditions caused Plaintiff to make changes to her work activity on the alleged onset date of January 1, 2007 and ultimately caused her to stop working on September 1, 2008. (*Id.*). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on March 8, 2012. (Tr. pp. 77-80). Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on October 31, 2012 at which Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared

and testified.  (Tr. pp. 84-85, 30-68).[1]  On November 29, 2012, the ALJ issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 11-29).  The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on January 10, 2014, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-4).  It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In her cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

> 1)     the Administrative Law Judge erred in not enlisting the assistance of a medical expert and
>
> 2)     the Administrative Law Judge relied on flawed vocational expert testimony.

(Rec. doc. 11-2, pp. 7, 10).

Relevant to the resolution of the foregoing issues are the following findings that were made by the ALJ:

> 1.     The claimant last met the insured status requirements of the Social Security Act on December 1, 2011;
>
> 2.     [t]he claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2007 through her date last insured of December 1, 2011 (20 CFR 404.1571 *et seq.*);
>
> 3.     [t]hrough the date last insured, the claimant had the following severe impairments:  degenerative disc disease of the cervical and lumbar spine, polysubstance dependence, depression, and anxiety disorder, not otherwise specified (20 CFR 404.1520(c));
>
> 4.     [t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part

---

[1] At the administrative hearing Plaintiff, through counsel, amended the alleged disability onset date to September 6, 2008.  (Tr. p. 33).

404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526);

5.      [a]fter careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could not climb ladders, ropes, or scaffolds. The claimant could perform frequent reaching above shoulder level with both arms.  Prior to the date last insured, the claimant was limited to simple, routine, repetitive tasks and low stress jobs, defined as requiring just occasional decision making and occasional changes in the work setting;

6.      [t]hrough the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565);

7.      [t]he claimant was born on July 12, 1965 and was 46 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563);

8.      [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564);

9.      [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10.     [t]hrough the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)); and

11.     [t]he claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2007, the alleged onset date, through December 1, 2011, the date last insured (20 CFR 404.1520(g)).

(Tr. pp. 16, 17, 18, 23, 24).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C.

§405(g) to two inquiries: (1) whether substantial evidence of record supports the

Commissioner's decision, and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this

determination, the Commissioner undertakes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.   an individual who does not have a "severe impairment" will not be found to be disabled.

3.   an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.   if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5.   if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first 4 steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The medical evidence that was generated during the relevant time period[2/] begins with a treatment note dated March 25, 2009 from Dr. Jimmie Varnado of the Varnado Family Practice Clinic ("VFPC") where Plaintiff was seen for a rash on her face.   The assessment was rosacea and Doxycycline and other medications were prescribed.  (Tr. p. 289).  A routine checkup was performed at the VFPC on May 27, 2009.  (Tr. pp. 291-294). Mammography that was conducted on June 3, 2009 was negative.  (Tr. p. 295).

Plaintiff was next seen at the VFPC on August 3, 2009 for complaints of headaches, nausea, and vomiting.   She also requested additional antidepressant medication after experiencing insomnia and increased anxiety secondary to an ongoing divorce.   The assessment included insomnia, depression, increased blood pressure, and headaches for which Plaintiff was prescribed Cymbalta, Phenergan, Demerol, and Klonopin.  (Tr. p. 296). No significant abnormalities were detected through an MRI of the brain on August 13, 2009.  (Tr. p. 298).  On December 23, 2009, Plaintiff reported that while the prescribed Klonopin was helpful, Cymbalta was not effective.  A trial of Pristiq was begun and Plaintiff was given additional prescriptions for Klonopin, Levacet, and Lortab.  (Tr. p. 297).

Pursuant to a referral from Dr. George, Plaintiff was seen by Dr. Socrates Zapata of the Advanced Pain Institute on January 5, 2010 for complaints of neck and low back pain. Plaintiff reported a workplace injury some 10 years earlier that had occurred while she was lifting a patient.   According to the doctor's treatment note, Plaintiff was at that time working full-time as a nurse.   The assessment was the reported workplace injury and a

---

[2/] Under 20 C.F.R. §404.1512(d), the Commissioner is required to develop the medical history of a DIB claimant for at least 12 months prior to the month in which the application for benefits was filed unless there is reason to believe that development of an earlier time period is necessary.  As Plaintiff protectively filed her application for DIB on August 16, 2011 but alleged a disability onset date of September 6, 2008 (note 1, *supra*), the relevant time period begins with the earlier of those 2 dates.

history of lumbar spondylosis without myelopathy.   An MRI of the lumbar spine was ordered and Plaintiff was to receive an injection at the bilateral sacroiliac joint.  (Tr. pp. 302-303).  Plaintiff returned to Dr. Varnado on February 19, 2010 to obtain medication refills and for surgical clearance in connection with an upcoming breast reduction procedure.  She was said to be doing well at the time with no complaints.  The assessment was pre-operative clearance, anxiety, and headaches and Plaintiff was given refills for Cymbalta, Klonopin, and Lortab.   Additional testing was to be scheduled.  (Tr. p. 299). Macromastia surgery was performed on February 23, 2010.  (Tr. pp. 266-267).

Plaintiff was next seen at the VFPC on May 20, 2010 for complaints of nasal congestion, headaches, and coughing for 3 days.  The assessment was sinusitis, anxiety, and headaches.  Plaintiff was given refills for Cymbalta and Klonopin and was additionally prescribed Amoxil, Medrol Dose Pak, and Levacet.  (Tr. p. 305).  On September 14, 2010, Plaintiff underwent an MRI of the lumbar spine which revealed changes of varying degrees at the L1-L2, L2-L3, L3-L4, L4-L5, and L5-S1 levels.  (Tr. pp. 315-316).  On September 20, 2010, Plaintiff was seen by Dr. Gregory Ward for complaints of low back and bilateral leg pain, the right worse than the left.  Plaintiff rated her pain level as a "7" without medication, her supply of which had been exhausted 3 weeks earlier.  Gait, tone, and deep tendon reflexes were all normal and strength was only slightly diminished in the lower extremities but there was some radicular involvement on the right.  The impression was low back pain and degenerative joint disease.  Unidentified medication was prescribed.  (Tr. pp. 312-314).

Plaintiff returned to Dr. Varnado on October 28, 2010 to obtain medication refills and for a general check-up.  An ovarian cyst had apparently been revealed through MRI studies.   The assessment was an ovarian cyst and migraine headaches.   Plaintiff was

referred to a gynecologist and was prescribed Lortab and Lexapro.  (Tr. p. 304).  She was next seen by Dr. Ward on November 3, 2010 and complained of weakness and burning to the legs.  Although medication was reportedly effective, Plaintiff rated her pain as a "9."  Upon physical examination, Plaintiff exhibited a normal gait and strength was only slightly diminished in the lower extremities but she did have tender paraspinals, the right greater than the left.  The impression was low back pain and degenerative disc disease with radiculopathy.  Unidentified medication was prescribed.  (Tr. p. 311).  Plaintiff related an increase in back pain on December 2, 2010 and an increase in her blood pressure was thought to be attributable to her being out of pain medication.  Without such medication, Plaintiff rated her pain as an "8."  She was reportedly working as a sitter at the time which involved a great deal of pushing and pulling and further exacerbated her pain.  Physical examination findings included abnormal sensation in the form of shooting pain, the right greater than the left, and a reduced range of back motion.  The impression was low back pain, degenerative disc disease with radiculopathy, and facet arthropathy along with depression secondary to pain.  Plaintiff was prescribed Toradol and was restarted on Lexapro.  An epidural steroid injection was to be administered at L4-5, EMG studies of the lower extremities were to be scheduled, and facet joint injections were to be considered as a possibility.  (Tr. p. 310).

After having had a root canal that morning, Plaintiff was seen again by Dr. Ward on December 29, 2010 for continued complaints of low back pain and bilateral leg pain, the right greater than the left.  Although medication was characterized as effective, Plaintiff's pain was rated as a "10" even with it.  Lexapro was also helping but Plaintiff was noted to be crying.  Physical exam findings were positive for bilateral paraspinal tenderness to the

neck and back with muscle spasm.  The impression was unchanged from the previous visit and Plaintiff was administered an injection of Toradol.  (Tr. p. 309).

The next set of medical records were generated on March 25, 2011 when Plaintiff was evaluated at the Acadiana Addiction Center ("AAC") with presenting problems being identified as chronic and progressive opiate and barbiturate use consisting of Lortab, Suboxone, Soma, and Xanax.  She had taken Klonopin, Soma, and Suboxone that morning and had last worked with hospice patients a few months earlier.  A systems review revealed numerous positive findings with Plaintiff experiencing sleep disturbance, depression, anxiety, and suicidal ideations with no plan or intention.  She also exhibited a depressed, anxious, and crying/emotional mood and her insight and judgment were "limited."  The assessment was opioid and anxiolytic dependence, hypertension, with a then-current GAF score of 25.  Routine detoxification was ordered.  (Tr. pp. 321, 325-333). A TB test was administered on March 27, 2011.  (Tr. p. 334).  Plaintiff was seen again at the AAC on March 28, 2011, relaying a history of drug abuse and treatment stints over the years.  The diagnosis was polysubstance abuse, mood disorder (not otherwise specified), anxiety, disorder (not otherwise specified), back pain, and marital/family discord with a GAF score of 35.  Trazodone was prescribed and Plaintiff was to return to the clinic as needed.  (Tr. pp. 322, 335-339).

On July 7, 2011, Plaintiff was seen again by Dr. Varnado for medication refills and for complaints of frequent urination.  The impression was polyuria, depression, hypertension, and hematuria and Plaintiff was prescribed Celexa, Klonopin, Benazepril, and Bactrim.  (Tr. p. 306).  A subsequent visit to the VFPC on November 28, 2011 was for menopause-related symptoms.  The assessment was depression, hypertension, anxiety, and headaches.  Abilify

was added to Plaintiff's medication regimen of Celexa, Benazepril, and Klonopin.  (Tr. p. 401).

On December 2, 2011, Plaintiff underwent a consultative psychological evaluation by Dr. James Smith.  Presenting problems were identified as spondylosis, drug addiction, and depression.  Plaintiff appeared for the evaluation well-groomed, dressed in appropriate attire, cooperative, and polite; rapport was easily established and maintained.  She related to Dr. Smith being sad and staying in bed all day, describing symptoms of depression that reportedly occurred between 5 and 6 days per week for the previous several years. Plaintiff occasionally cried during the interview but overall her affect was relatively normal, she laughed frequently, and her interactions with the doctor were generally positive.  Historically, Plaintiff indicated that she had been treated for depression and anxiety since the age of 13, including 5 different antidepressants and 4 different anti-anxiety medications, most recently with Celexa and Abilify via Dr. Varnado.  Plaintiff acknowledged that the medications were helpful.  Hospitalizations included 1 for anorexia in 1982 and 4 admissions between 2005 and 2011 for opiate dependency including a 28-day stay at the AAC the previous year.  There had been no outpatient aftercare treatment. Plaintiff had lost her nursing license as a result of her opiate use and the drugs that she had been using were obtained by "doctor-shopping" in Houston or purchasing them off the street.

From a functional standpoint, Plaintiff was able to attend to all basic activities of daily living, including being able to cook, clean, and do laundry independently.  Plaintiff engaged in hobbies such as reading self-help books and walking and she spent time with her 3 adult children.  She possessed a driver's license but was fearful of driving and had

several close friends but chose not to see them.  Vocationally, Plaintiff had last worked for 2 weeks as a sitter for hospice patients in 2010.  She had previously worked as a nurse for 10 years until 2007 when she lost her license for diverting and abusing narcotics.  In terms of presentation, Plaintiff was fully oriented to place, time, and situation.   Affect was appropriate and ranged from normal to bright, Plaintiff frequently laughed with and at the doctor, and interactions with him were generally positive and sociable.  There were no suicidal or homicidal ideations, no signs of hyperactivity or agitation, eye contact was good, thought processes were logical, and speech was coherent, organized, and relevant. Comprehension was good, articulation was intelligible, and Plaintiff's expressive language skills were above average.   Testing revealed adequate memory, attention and concentration as well as learning ability and language development, judgment and insight were fair, and Plaintiff was capable of independently handling any awarded benefits.

In summary, Dr. Smith noted Plaintiff's description of symptoms consistent with depression and an extensive history of medication treatment for that condition.  Plaintiff also had an extensive history of opiate addiction and treatment although she continued to take opiates for pain management.  Nevertheless, general social functioning was good, Plaintiff was able to form and to maintain close relationships, and she could engage in and derive satisfaction from leisure activities.  Plaintiff's depression appeared to have preceded, but perhaps been exacerbated by, her addiction.  Her communication and language skills were adequate and she was able to understand, follow, and remember directions.  Memory and intellectual functioning were adequate and adaptive functioning and activities of daily living were good.  Dr. Smith opined that despite her condition, Plaintiff retained the ability to understand, remember, and carry out simple as well as familiar detailed instructions; to

maintain attention and to perform simple repetitive tasks for 2-hour blocks of time; to sustain effort and persist at a normal pace over the course of a 40-hour work week; to make simple work-related decisions and to tolerate the stress and demands associated with day-to-day work activity; to relate to others, including supervisors and coworkers; and, to cope with routine changes in the work environment, to set realistic goals, and to make plans independently.  Dr. Smith deferred to the opinions of a physician as to whether Plaintiff suffered from any physical limitations.  The diagnostic impressions were as follows:  Axis I – major depressive disorder and opiate dependence; Axis II – none; Axis III – deferred; Axis IV – unemployment; and, Axis V – a GAF of 62.  (Tr. pp. 353-356).

Plaintiff failed to appear for a consultative evaluation with Dr. Rabito on December 7, 2011.  (Tr. p. 359).  She was subsequently seen at the VFPC on December 27, 2011 to discuss the Abilify side-effect of weight gain which was otherwise working well.  The assessment was depression and obesity.  The dosage of Abilify was to be reduced and Xenical was prescribed.  (Tr. p. 400).  On January 5, 2012, the Administration's examiner who was assigned to Plaintiff's case made a formal request for review by a specialist in the field of mental disorders.  (Tr. p. 357).  That review was completed by Dr. Darla Burnett, an Administrative psychologist, on January 12, 2012.  (Tr. p. 358).

On March 6, 2012, Plaintiff underwent a consultative evaluation by Dr. Catherine DiGiorgio of the Southern Louisiana Disability Clinic ("SLDC").  Plaintiff presented with problems that were the same as those identified by her in her DIB application paperwork. She reported daily radiating leg pain at a level of "6" to "10" that was relieved with bed rest and heat in lieu of pain medication which she had declined in light of her history of substance abuse and 5 inpatient admissions over the years, the most recent one being 1

year earlier. Plaintiff was able to assist with and perform household activities with difficulty, could dress and feed herself independently, was able to drive, and could visit with family and friends. She estimated that she could lift 10 to 12 pounds, sit for 15 minutes, stand for 30 minutes, and walk 1 block. Upon physical examination, Plaintiff had 5/5 muscle strength throughout, normal tone and movement, normal sensation, and a full range of motion in all joints of the back and neck. Gait and station were normal and Plaintiff was able to heel-to-toe walk without difficulty or pain. Grip strength was also normal. Functionally, Plaintiff could perform various postural maneuvers without difficulty. In conclusion, Dr. DiGiorgio found no abnormalities related to Plaintiff's spondylosis, normal mental status examination results, and Plaintiff appeared to be doing well at the time with respect to her drug addiction. All in all, no physical or mental limitations were apparent. (Tr. pp. 361-364).

The following day, Plaintiff was seen again by Dr. Varnado for headaches of a few weeks' duration. The impression was headaches; Plaintiff was referred to a neurologist and was prescribed Toradol, Phenergan, and Fioricet. (Tr. p. 399). Plaintiff's blood pressure had spiked by March 21, 2012 and she was assessed with hypertension, migraines, and depression. She was noted to be crying during the evaluation. Prescriptions were written for Norvasc, Depakote, Demerol, and Phenergan followed by the notation "Dad driving her." (Tr. p. 398). Plaintiff was apparently seen by Dr. Fred DeFrancesch of the NeuroMuscular Medical Associates ("NMMA") on June 13, 2012 for complaints of back pain and although the doctor's note contains an "[a]ctive [p]roblem [l]ist" identifying various conditions, no objective findings, impressions, or treatment recommendations were recorded. (Tr. p. 394).

13

On June 15, 2012, Plaintiff was seen again by Dr. Zapata of NMMA for back pain.  On this occasion, she reported an inability to drive due to numbness in her legs and had fallen twice due to her legs giving out, prompting emergency room visits.  She also reported neck pain which radiated down the back and into the legs above the knees and knee pain of recent onset with a feeling that her knees would not support her anymore.  There was also tingling and burning pain in the thighs, trouble with forward bending and pain upon Valsalva maneuver, and a recent episode of bowel incontinence.  Plaintiff related receiving injections from Drs. Barrow and Landreneau with minimal relief and she was taking Lortab and Percocet as needed that were left over from an old supply of medications.  Upon physical examination, muscle strength was 2/5 in the lower extremities, Plaintiff exhibited an antalgic gait, and there was tingling above the knees in the lower extremities.  A spinal examination revealed pain with flexion, less with extension, pain at L3-4, L4-5, and L5-S1, and tenderness to the lumbar paraspinals on palpation.  There was also tenderness to palpation and crepitus to the knees.  The assessment was low back pain/lumbago, knee pain, chronic pain syndrome, facet disorder, lumbosacral spondylosis without myelopathy, and cervicalgia/neck pain.  Plaintiff was prescribed Gabapentin, Lortab, and Robaxin and various testing was ordered.  (Tr. pp. 391-393).

Plaintiff returned to NMMA on July 2, 2012 to discuss the results of recent MRI studies of the cervical and lumbar spines.  She indicated that her pain was the greatest in the morning and late in the evening and increased on Valsalva maneuver but somewhat alleviated with forward flexion.  Further treatment options were discussed but Plaintiff did indicate that her prescribed medication regimen allowed for an improved quality of life.  Still, Plaintiff rated her pain at a level of "7."  Physical examination findings were

unchanged from the previous visit.  The assessment was the same except that knee pain and facet disorder were reversed from their original order in terms of severity.  Facet joint injections were ordered and Plaintiff was given refills for Robaxin, Lortab, and Gabapentin. (Tr. pp. 389-390).  On August 1, 2012, Plaintiff was administered bilateral lumbar facet joint injections and lumbar dorsal medical branch blocks with fluoroscopy at the hands of Dr. DeFrancesch.  Her pain was reduced from a level of "7" to a "0" as a result of the procedure.  (Tr. pp. 385-386).

Plaintiff returned to the VFPC on August 15, 2012 for medication refills and for complaints of an increase in her blood pressure.  No suicidal or homicidal ideations were noted.  The assessment was hypertension, depression, and insomnia.  Celexa was discontinued, the dosage of Benazepril was increased, and Plaintiff was started on Prozac and Ambien.  (Tr. p. 397).  A follow-up appointment with Dr. DeFrancesch went forward on August 29, 2012 and Plaintiff was given refills for Robaxin, Lortab, and Gabapentin.  (Tr. p. 384).

On September 21, 2012, Plaintiff underwent behavioral health screening at the Rosenblum Mental Health Center ("RMHC").  Plaintiff was noted to be "uncontrollably tearful" during the interview but denied that she needed to be hospitalized.  Her mood was depressed most of the time and she reported feelings of nervousness and panic attacks, manic episodes with increased energy, rapid speech, and insomnia, and euphoric moods. She also reported a lack of energy and motivation, isolation, and anhedonia, symptoms which had allegedly persisted for years.  Past mental health treatment was positive when Plaintiff was 17 years of age and again in 2002 for psychotic behavior.  Drug usage was

denied.  A routine behavioral health assessment was scheduled for October 3, 2012.  (Tr. pp. 373-378).

The final treatment note that was admitted in the administrative proceedings below documents Plaintiff's return to Dr. DeFrancesch on September 26, 2012.  Plaintiff's father was hospitalized at the time and she reported increased neck pain and stiffness secondary to staying at the hospital and not sleeping well.  Robaxin was not working and Flexeril was to be substituted for it.  Physical examination findings were the same as those from Plaintiff's last visit to NMMA.  The assessment was also unchanged.  Plaintiff was given a refill of Gabapentin and was started on Lortab and Flexeril.  (Tr. pp. 381-383).

As noted earlier, a hearing *de novo* before an ALJ went forward on October 31, 2012. After the documentary exhibits were formally admitted into evidence Plaintiff's counsel made an opening statement in which he first moved to amend the disability onset date to September 6, 2008.  He then argued that Plaintiff continued to experience significant emotional problems such that she was unable to consistently work a 40-hour workweek but had declined health care providers' suggestion that she obtain inpatient treatment.  (Tr. pp. 32-34).  Plaintiff then took the stand and was questioned by the ALJ.  She was 47 years of age at the time, had completed 3 years of college education, and had previously worked as a licensed practical nurse, first at a rehabilitation hospital in Baton Rouge and later at a clinic, losing her license 6 to 7 years earlier.  Plaintiff had also worked at a district attorney's office before attending nursing school and as a sitter and nurse's aide over the years.  When asked why she was unable to work prior to the expiration of her DIB insured status in December of 2011, Plaintiff testified that on an average of 17 to 20 days out of the month that she was manic and depressed to the extent that she could not get out of bed,

16

perform normal activities, or even bathe.  After briefly summarizing the then-extant medical records, the ALJ noted that there was an absence of any record of professional mental health care prior to 2012, an absence that Plaintiff acknowledged.  When asked about her back impairment, Plaintiff testified that she was unable to stand or walk for long periods of time, that her legs became numb to the knees, that she was unable to get comfortable while sleeping, and that she was unable to lift.  When attempting to do household chores like sweeping and mopping, she had reportedly slipped and fallen.  (Tr. pp. 34-43).

The ALJ then queried Plaintiff on the nature and extent of her regular daily activities. On the days that she was severely depressed, Plaintiff testified that she could scarcely tend to her personal needs and simply stayed in bed in a dark room, did not answer the phone, and did not communicate with family members.  She was able to cook and do the dishes at times but largely relied upon her husband to perform such tasks.  While Plaintiff was able to drive, she was afraid to do so after getting in two accidents.  She occasionally went grocery shopping, did some reading in her leisure time, and attended church.  Despite being unable to sit for long periods of time, Plaintiff was apparently able to spend an hour and 15 minutes in the car getting to the hearing that morning.  Plaintiff had received injections to her back and similar treatment to her neck was being considered.  She estimated that she could sit for 15 to 20 minutes before needing to stand, could stand for 20 to 30 minutes before needing to sit, and could walk for about 10 minutes.  Lifting objects weighing more than 5 pounds was problematic.  As the hearing progressed, Plaintiff asked for permission to stand up.  (Tr. pp. 43-47).

In terms of mental limitations, Plaintiff testified that she had problems with concentration, memory, and staying focused. However, her biggest issue was depression that essentially left her bedridden at least two weeks out of the month. Having experienced several inpatient admissions for drug addiction, Plaintiff had declined the invitation to be hospitalized for depression because she was afraid of the other patients. Plaintiff also had not returned to RMHC since being seen there in September and the mental health treatment that she had received was in the form of antidepressant medication prescribed by her primary care physician and some counseling with a social worker. (Tr. pp. 47-51).

Upon being tendered to her attorney for further questioning, Plaintiff testified that within the previous year she had seen a social worker every week for 6 weeks until transportation issues made that difficult. She further testified that when she first began treatment at the VFPC in 2006 and 2007, she suffered from essentially the same symptoms that she was experiencing at the time of the hearing. Only when Plaintiff realized that she needed more help than VFPC could provide (and at the suggestion of her doctor there) did she seek out further treatment from RMHC. And despite being "obsessive compulsive" with respect to housework, on those days on which she was severely depressed (which was roughly half of the month), she undertook no chores, shopping, socializing or even personal hygiene activities. When asked if she could perform a less stressful, demanding job such as work at a library, Plaintiff responded in the negative, citing a lack of dependability. After being directed to the RMHC report of September 21, 2012, Plaintiff's counsel acknowledged that it contained no diagnosis. (Tr. pp. 51-61).

Kasey Suggs, a VE, was the next witness to take the stand. She began by classifying the demands of Plaintiff's past work as a licensed practical nurse as medium-level, skilled

work and that of her past job as a home health aide as involving medium-level, semi-skilled work.  After clarifying that Plaintiff was on no medication for pain relief at the time other than Neurontin, the ALJ posed a hypothetical question to the VE that assumed an individual who was capable of light-level work with no ladders, ropes, or scaffolds; who was capable of frequent reaching above shoulder level with both arms; and who required simple, routine, repetitive work that was of a low stress level with only occasional decisionmaking and changes in the work setting.  With those limitations in mind, the VE testified that the described individual would be unable to perform Plaintiff's past work.  However, and further considering Plaintiff's age, education, and work experience, the described individual could function as an information clerk (DOT code 237.367-018)(U.S.: 84, 890; LA: 1, 235), an order filler (DOT code 209.507-034)(U.S.: 214, 772; LA: 2, 826), or a general office clerk (DOT code 209.667-014)(U.S.: 228, 553; LA: 2, 929), with significant numbers of such jobs existing in the noted numbers in the national and local economies.  If, however, the individual had to miss more than 2 to 3 days of work per month, there would be no jobs that she could perform.  (Tr. pp. 61-63).

The VE was then tendered to Plaintiff's counsel for further questioning.  After clarifying what constituted a "low stress" job, the VE was asked to provide the Census Codes or SOC codes for the 3 jobs that she had identified.  Once those codes were provided, the VE admitted that the available job numbers that she had testified to were not just for the DOT numbers that she had identified.  Census Code 540, for example, which corresponded to information clerk, included 14 DOT titles.  The VE, however, clarified that she had only provided the available job numbers for light, unskilled information clerk positions and did not include semiskilled or skilled occupations that were outside the

parameters of the ALJ's hypothetical question.  After the VE conceded that she had relied upon information provided in a publication known as the Occupational Employment Quarterly II ("OEQII"), the use of which counsel argued had been repudiated by the AC, she again emphasized that the job numbers that she had provided comported with the profile of the VE's hypothetical question.  Counsel then took exception with the VE's methodology and promised further briefing on that issue and the hearing was concluded on that note. (Tr. pp. 63-68).

Plaintiff challenges the Commissioner's decision to deny DIB on two grounds.

First, she argues that the ALJ failed to avail himself of the services of a medical expert ("ME") to determine whether and when Plaintiff's depression reached a disabling level of severity, particularly given the fact that her insured status and consequent entitlement to DIB expired in December of 2011.  In light of that cessation of coverage, for a Social Security claimant like Plaintiff to demonstrate that she is entitled to DIB, she must prove not only that she is disabled but that she became disabled prior to the expiration of her insured status.  *Anthony*, 954 F.2d at 295; *see also Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985) ("Any impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability.").

Social Security Regulations provide that "Administrative law judges may . . . ask for and consider opinions from medical experts on the nature and severity of . . . [a claimant's] impairment(s) and on whether . . . [a claimant's] impairments(s) equals the requirements of any impairment listed in . . . [the Listing of Impairments]."  20 C.F.R. §404.1527(e)(2)(iii)(emphasis added).  As the emphasized portion of §404.1527(e)(2)(iii) and the case law interpreting it make clear, while an ALJ has the option of enlisting the aid

of a ME, the requirement that he do so is by no means mandatory.  *Malone v. Colvin*, No. 13-CV-3043, 2015 WL 1291824 at *14-15 (S.D. Tex. Mar. 16, 2015); *Gipson v. Colvin*, No. 12-CV-3258, 2013 WL 5945649 at *10 (S.D. Tex. Nov. 6, 2013); *Reliford v. Colvin*, No. 12-CV-1850, 2013 WL 1787650 at *14 (S.D. Tex. Apr. 25, 2013); *Forest v. Astrue*, No. 11-CV-2017, 2012 WL 3137844 at *13-14 (E.D. La. Aug. 1, 2012), *adopted*, 2012 WL 3437514 (E.D. La. Aug. 15, 2012).  The foregoing cases and the Regulations further make clear that the responsibility for determining a claimant's residual functional capacity to work lies with the Commissioner, 20 C.F.R. §404.1545, and at the administrative law judge hearing level, that determination is entrusted to the ALJ.  20 C.F.R. §404.1546(c).

In addressing Plaintiff's first challenge to the Commissioner's decision, the Court initially notes that prior to the administrative hearing, Plaintiff made no specific request that the ALJ employ the services of a ME, nor did Plaintiff object to the absence of such an expert at the hearing or otherwise alert the ALJ that the task of determining Plaintiff's disability onset date warranted such treatment.  Among the reasons cited by Plaintiff in support of her first challenge are that her drug abuse is a symptom of her condition and that her primary care physician's diagnoses and issuance of prescriptions for antidepressant medications are evidence that she was in need of care.  The question, however, is not whether Plaintiff suffered from a particular condition – even one that required treatment – but whether that condition rendered Plaintiff unable to perform any work activity whatsoever.  *McClendon v. Barnhart*, 184 Fed.Appx. 430, 431 (5th Cir. 2006)(mere existence of impairment does not establish disability).

Plaintiff's other reasons in support of her first challenge – that her depressive symptoms tend to wax and wane, that her primary care physician is not an expert in the

field of mental conditions, and that only such an expert could separate the symptoms and limitations of her drug abuse from those resulting from her depression – are significantly undercut by the fact that the Commissioner, in an effort to better understand when and to what extent Plaintiff's non-exertional limitations had on her ability to work, did indeed send Plaintiff for a consultative evaluation by a specialist in the field, namely, Dr. Smith, whose detailed findings, along with those of Plaintiff's treating physicians, were subsequently reviewed and passed upon by yet another psychologist, Dr. Darla Burnett. (Tr. pp. 70-76).  Being psychologists, Drs. Smith and Burnett were obviously aware of the nature and consistency of symptoms related to depression and Plaintiff's history of medication treatment for that condition and both were fully apprised of Plaintiff's past history of substance abuse.  Despite Plaintiff's condition, Dr. Smith found that she retained the ability to understand, remember, and carry out simple as well as familiar detailed instructions; to maintain attention and to perform repetitive tasks for 2-hour blocks of time; to sustain effort and persist at a normal pace over the course of a 40-hour work week; to make simple work-related decisions and to tolerate the stress and demands associated with day-to-day work activity; to relate to others, including supervisors and co-workers; and, to cope with routine changes in the work environment, to set realistic goals, and to make plans independently.  For her part, Dr. Burnett did not even believe that Plaintiff suffered from a severe impairment, an opinion that the ALJ admittedly accorded minimal weight.  (Tr. p. 22).  Given the opinions of Drs. Smith and Burnett, whether the involvement of a further psychologist or psychiatrist as a ME would have inured to Plaintiff's benefit or otherwise changed the outcome is entirely speculative.

22

Consequently, the Court cannot agree with Plaintiff that Dr. Smith's consultative evaluation report can or should be characterized as "sunny" and therefore unworthy of credence.  Although Dr. Smith was the evaluator chosen by the Commissioner, his report is by far the most comprehensive report in the record that speaks to Plaintiff's non-exertional impairments.  The ALJ can hardly be faulted for placing significant reliance on that most informative piece of documentary evidence.  And given Plaintiff's education, training, and work experience in the field of nursing, it is entirely understandable that the ALJ would place some reliance on Plaintiff's refusal to obtain the inpatient treatment that was recommended to her as the Regulations require (20 C.F.R. §404.1530) and a claimant's failure to do so is suggestive of non-disability.  *Villa*, 895 F.2d at 1024.  The record reflects that, not only did Plaintiff deny that she needed inpatient treatment for depression when she has repeatedly availed herself of that opportunity in the past for substance abuse, she also failed to appear for a routine outpatient behavioral assessment on October 3, 2012 that was scheduled with the RMHC.  In the end, the extensive symptoms that Plaintiff testified about at the administrative hearing simply lack the objective support in the record that is required.  *Id.*  There is nothing to indicate that the discretionary use of an ME by the ALJ would have remedied that deficiency or otherwise changed the outcome.  Plaintiff's first challenge is without merit.

In her second challenge to the Commissioner's decision Plaintiff argues that the Commissioner failed to satisfy her burden at the fifth step of the §404.1520 analysis, in that the VE, in answer to a hypothetical question that properly included the functional limitations supported by the evidence and recognized by the ALJ, identified occupational job titles that Plaintiff was capable of performing while providing job numbers for an entire

Census Code classification which included multiple job titles within the Dictionary of Occupational Titles ("DOT").

At step five of the §404.1520 sequential analysis, an ALJ may, in determining whether there are other jobs available that a claimant can perform, ". . . take administrative notice of reliable job information available from various governmental and other publications," including the DOT, which is the first-listed of 5 such publications.  20 C.F.R. §404.1566(d)(1).  However, where a claimant like Plaintiff also suffers from non-exertional impairments, ". . . the ALJ <u>must</u> rely upon vocational testimony or other similar evidence to establish that such jobs exist."  *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985))(emphasis added).  "The value of a vocational expert is that [s]he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed."  *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1985).  "A vocational expert is able to compare all the unique requirements of a specific job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job."  *Id.*  Recognizing that the DOT is not comprehensive – because it cannot and does not purport to include each and every specific skill and qualification for a particular job – the Fifth Circuit in *Fields* went so far as to conclude that the DOT is not "similar evidence" that would satisfy the Commissioner's burden of proof at the fifth step of the sequential analysis.  *Fields*, 805 F.2d at 1170-71.  "DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job."  *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000).

The OEQ, the publication that the VE testified that she relied upon, reports job numbers by census codes, not DOT codes, as specific DOT job numbers apparently do not exist. *Guiton v. Colvin*, 546 Fed.Appx. 137, 141-42 (4th Cir. 2013); *Liskowitz v. Astrue*, 559 F.3d 736, 744-45 (7th Cir. 2009). Nevertheless, the OEQ is an acceptable source of information upon which VE's typically rely. *Guiton*, 546 Fed.Appx. at 142 (quoting *Liskowitz*, 559 F.3d at 744). The Court need not, however, engage in the statistical exercise Plaintiff suggests because the VE quite clearly testified that the job numbers that she provided for Census Code 540 were only for light, unskilled positions, as required by the ALJ's hypothetical question, and not the other 13 positions that fell under the DOT job title which included skilled and semiskilled occupations. (Tr. pp. 44-45). The available numbers of such light, unskilled information clerk positions, the Court recalls, were 84,890 in the U.S. and 1,235 in Louisiana. Those numbers constitute a "significant number" for purposes of sustaining the Commissioner's burden at the fifth step of the §404.1520 analysis. *Monroe v. Shalala*, 55 F.3d 633, 1995 WL 313965 at *8 (5th Cir. 1995)(table); *Denais v. Sec. of Health & Human Services*, 820 F.Supp. 278, 282-83 (W.D. La. 1993); *O.D.W. v. U.S. Comm'r. Soc. Sec. Adm.*, No. 09-CV-0023, 2009 WL 5108393 at *2 (W.D. La. Dec. 17, 2009); *March v. Comm'r. Soc. Sec. Adm.*, No. 07-CV-1716, 2008 WL 5273725 at *4 (W.D. La. Dec. 16, 2008).

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied and that Defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14

days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 29th day of April 2015.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE